U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2020 FEB -4 AM 9: 46

CLERK

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JENNIFER W.,                    )
                               )
        Plaintiff,             )
                               )
    v.                         )        Case No. 5:19-cv-37
                               )
COMMISSIONER OF SOCIAL         )
SECURITY,                      )
                               )
        Defendant.             )

**OPINION AND ORDER**
**(Docs. 10, 14)**

Plaintiff Jennifer W. brings this action under 42 U.S.C. § 405(g), requesting reversal of

the decision of the Commissioner of Social Security denying her applications for supplemental

security income (SSI). (Doc. 3.) Pending before the court is Plaintiff's motion to reverse the

decision of the Commissioner (Doc. 10) and the Commissioner's motion to affirm (Doc. 14).

For the reasons stated below, Plaintiff's motion is GRANTED, the Commissioner's motion is

DENIED, and the matter is REMANDED for calculation of benefits.

### Background

Plaintiff was 32 years old on her alleged onset date of June 14, 2011. At an April 18,

2014 hearing, Plaintiff testified that a 1997 motor vehicle accident ("MVA") in which she was

involved resulted in injuries to her right arm and both knees and broke both of her femurs.

(AR 44–45, 49.) She further testified that the 1997 accident also caused post-traumatic stress

disorder ("PTSD") and that the accident is a reason why she is afraid of driving. (AR 59.) She

testified to multiple mental and physical impairments including pain, difficulties with her hands,

legs, and left shoulder, anxiety, depression, fibromyalgia, irritable bowel syndrome ("IBS"),

carpal tunnel syndrome, difficulty concentrating, and panic attacks. (*See* AR 42–53.) The record also reflects morbid obesity; Plaintiff testified to difficulty losing weight. (AR 45.)

Plaintiff testified that she is divorced and has one daughter. (AR 40.) For education, she earned a GED and completed some college. (AR 41.) She has a driver's license and she can drive but she does not have a car and is afraid of car travel especially in bad weather. (AR 42, 48, 50.) She is right-handed. (AR 45.) She testified that she tried to work providing home care to her aunt in 2008. (AR 52.) She has not worked since her alleged onset date. (AR 42.)

Plaintiff stated that in an average day she gets her daughter ready for school and does tasks around the house. (AR 55.) She does her own housework but testified that she paces herself and that it takes her a long time to do the dishes because she has to take breaks between cleaning batches of dishes. (*See* AR 46–47.) She testified to having to play "catch-up" on housework when the prior day was a "bad day." (AR 55.) She uses a computer to watch videos and to communicate with friends and family. (AR 55–56.) She also sometimes visits friends at their houses. (AR 57.)

The record reflects a procedural history of more than a decade of efforts to obtain disability benefits. It appears that Plaintiff first applied for SSI on January 31, 2006 and that she filed a second application on October 27, 2009. (AR 108.) An Administrative Law Judge ("ALJ") denied those applications on June 13, 2011. (*Id.*) Plaintiff filed a third application for SSI on July 14, 2011. (*See* AR 106.) ALJ Dory Sutker held a hearing on that application on April 18, 2014 (AR 35–70) and issued an unfavorable decision on May 7, 2014, in which she also found no basis to re-open the prior June 2011 denial. (AR 17–27).

Plaintiff appealed the May 7, 2014 unfavorable decision to this court. The court remanded the case in a 31-page Opinion and Order dated May 8, 2017. [*Jennifer W.*] *v. Comm'r*

*of Soc. Sec.*, No. 2:15-cv-198 (D. Vt. May 8, 2017), ECF No. 14.[1]  Prior to the court's May 2017

decision, Plaintiff filed a fourth application for SSI on August 2, 2016.  (AR 892.)  Acting on the

court's May 2017 Opinion and Order, the Appeals Council remanded the case and

simultaneously ordered it consolidated with the August 2, 2016 application.  (AR 874.)

Pursuant to the remand order, ALJ Sutker convened a hearing on July 24, 2018.

(AR 717–69.)  Plaintiff appeared at the hearing and was represented by attorney Judith

Brownlow.  (AR 717.)  Plaintiff testified briefly at the hearing that she had previously been

prescribed a cane but that she cannot use it with her right arm because of pain and that she

cannot use it in her left hand due to lack of sensation in two (and sometimes three) fingers.

(AR 736–37.)

Three experts testified at the hearing: vocational expert ("VE") Louie LaPlante, non-

examining/non-treating physiatrist Andrew Brown, M.D., and non-examining/non-treating

psychologist James Claiborn, Ph.D.  Attorney Brownlow submitted a 16-page post-hearing

memorandum dated August 3, 2018.  (AR 1040–55.)  Psychologist Richard W. Root, II, Ed.D.,

wrote an evaluation on November 13, 2015 that included chronic PTSD as a "provisional

diagnostic impression[]."  (AR 1344.)  Dr. Claiborn submitted a statement dated September 29,

2018[2] regarding Dr. Root's November 2015 assessment.  (AR 1355–56.)[3]  Dr. Root submitted a

---

[1] The court's May 2017 Opinion and Order appears in the administrative record at
pages 840–870.

[2] Dr. Claiborn's statement is erroneously hand-dated 9/29/15.  (*See* AR 1356.)  The
correct year is plainly 2018, since the statement refers to the July 24, 2018 hearing.  (*Id.*)

[3] Dr. Root's November 13, 2015 evaluation was not part of the record that Dr. Claiborn
reviewed before the July 24, 2018 hearing.  The ALJ agreed to add Dr. Root's evaluation to the
record at the hearing (AR 722) and that Dr. Claiborn would have an opportunity to review it after
the hearing and state whether it changed his opinion (AR 742).

response on or about October 11, 2018. (AR 1359–62.) ALJ Sutker issued a 25-page unfavorable decision on January 2, 2019. (AR 666–90.) This appeal followed. (Doc. 3.)

**ALJ Decision**

Social Security Administration regulations set forth a "five-step, sequential evaluation process" to determine whether a claimant is disabled. *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (quoting *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014)). First, the Commissioner considers "whether the claimant is currently engaged in substantial gainful activity." *Id.* Second, if the claimant is not currently engaged in substantial gainful activity, then the Commissioner considers "whether the claimant has a severe impairment or combination of impairments." *Id.* Third, if the claimant does suffer from such an impairment, the inquiry is "whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments." *Id.* Fourth, if the claimant does not have a listed impairment, the Commissioner determines, "based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment." *Id.*

Finally, if the claimant is unable to perform past work, the Commissioner determines "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see* 20 C.F.R. § 416.920. The claimant bears the burden of proving her case at steps one through four. *Estrella*, 925 F.3d at 94. The burden shifts to the Commissioner at step five. *Id.*

Employing the five-step sequential analysis in her January 2, 2019 decision, ALJ Sutker first determined that Plaintiff has not engaged in substantial gainful activity since July 14, 2011. (AR 669.) At step two, the ALJ found that Plaintiff has the following severe impairments:

> [S]tatus post multiple fractures from a motor vehicle accident in October 1997; status post intramedullary rodding in the bilateral lower extremities; status post

4

ORIF of the right distal radius and ulna; osteoarthritis of the bilateral knees, left greater than right; posterior cruciate ligament tear of the left knee; fibromyalgia; obesity; an affective disorder (variously diagnosed as dysthymic disorder and persistent depressive disorder); and an anxiety disorder not otherwise specified (variously diagnosed as social anxiety, generalized anxiety disorder, unspecified anxiety disorder, and post-traumatic stress disorder) (20 CFR 416.920(c)).

(AR 669–70.) The ALJ noted that there was significant discussion at the hearing and in post-hearing submissions regarding PTSD. (AR 670.) She found that Plaintiff's PTSD was not a medically determinable impairment and also wrote: "Although the undersigned did not include PTSD as a severe impairment, the undersigned nevertheless fully considered the nature and extent of the claimant's psychiatric symptoms as well as the claimant's mental functioning regardless of the specific diagnoses." (*Id.*) The ALJ also found that Plaintiff's carpal tunnel syndrome was non-severe. (AR 671.)

At step three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (AR 671.) Next, the ALJ determined that Plaintiff has the residual functional capacity (RFC) to perform sedentary work as defined in 20 C.F.R. § 416.967(a),[4] except as follows:

[S]he could lift and carry up to 10 pounds occasionally and nominal weight (i.e., 1 pound) frequently; she could sit for 90 minutes at one time for a total of 6 hours in an 8-hour workday; she could stand for 15 minutes at a time and walk for 15 minutes at a time; she could stand and/or walk for a total of 2 hours in an 8-hour workday; she cannot climb ladders, ropes, or scaffolds; she cannot be exposed to hazards, such as unprotected heights and dangerous moving machinery; she could not crawl; she could stoop, kneel, crouch, and walk on uneven terrain for no more than 10% of the workday; she could not drive while on the job; she could

---

[4] That provision defines sedentary work as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

5

occasionally be exposed to humidity, wetness, temperature extremes, vibrations, dusts, odors, fumes, gases, and pulmonary irritants; she has no limitations with her left upper extremity; she could frequently reach in all directions with the right upper extremity; she could frequently finger, feel, handle, and push/pull with the right upper extremity; and she could occasionally use foot controls. She is limited to uncomplicated tasks (defined as tasks that typically can be learned in less than 30 days); she could concentrate, persist at tasks, and stay on pace for 2-hour blocks of time throughout the workday; she is limited to incidental contact with the general public (i.e., dealing with the public would not be part of job duties, but she could tolerate brief encounters, such as passing someone in a hallway); she could collaborate with coworkers and supervisors on routine matters; and she would need an environment without frequent tasks changes but she could tolerate occasional, routine changes.

(AR 674.)

At step four the ALJ found that Plaintiff has no past relevant work. (AR 689.) But considering the RFC and Plaintiff's age and education, the ALJ found at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (*Id.*) The ALJ accordingly concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since July 14, 2011. (AR 690.)

## **Standard of Review**

The Social Security Act defines disability, in pertinent part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act, a claimant will only be found disabled if his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court conducts "a plenary review of the administrative record to determine if there is substantial evidence, considering the

6

record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Estrella*, 925 F.3d at 95 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (per curiam)); *see also* 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. of N.Y. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938)). The "substantial evidence" standard is even more deferential than the "clearly erroneous" standard; facts found by the ALJ can be rejected "only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The court is mindful that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Plaintiff identifies six issues on appeal. First, she argues that the ALJ failed to follow the court's May 8, 2017 remand order. Second, she asserts that the ALJ's finding that her mental impairments do not meet the criteria of a listed impairment is unsupported by substantial evidence. Third, she contends that the ALJ erred in assessing the opinion evidence. Fourth, Plaintiff argues that the RFC is unsupported by substantial evidence. Fifth, she maintains that the ALJ's credibility assessment was not based on substantial evidence. Finally, Plaintiff asserts that the case should be remanded for payment of benefits. (Doc. 10 at 1.) The Commissioner argues that the ALJ's decision is supported by substantial evidence and complies with the applicable legal standards. (Doc. 14 at 1.)

## I.     Compliance with Court's 2017 Remand Order

Plaintiff contends that the ALJ failed to comply with the court's May 8, 2017 remand order by failing to give greater weight to the opinions of Plaintiff's treating psychologist, Camille Parker, and by failing to fully develop the record regarding Plaintiff's mental capacity. (Doc. 10 at 4–5.) The court accordingly begins by reviewing Ms. Parker's opinions and the requirements of the May 8, 2017 remand order.

### A.     Ms. Parker's Pre-Remand Opinions

Ms. Parker—a licensed psychologist-Master—began treating Plaintiff on June 23, 2010 and met with Plaintiff approximately twice a month at least through March 2013. (AR 383.) Ms. Parker wrote letters regarding Plaintiff on March 4 and May 24, 2013, and on March 5, 2014. (AR 383, 405, 620.) In her March 4, 2013 mental status report, Ms. Parker wrote that Plaintiff is "very pleasant to engage with when she feels understood + cared about otherwise very shy + withdrawing/avoiding." (AR 382.)

In a letter also dated March 4, 2013, Ms. Parker stated that Plaintiff is unable to drive in snow or freezing rain. (AR 383.) She also stated that Plaintiff reported "daily pain, stiffness, feelings of hopelessness, helplessness, diminished interest in daily activities, restricted emotional expression, tearfulness, anxious feelings and thoughts, restricted sense of the future, sense of isolation and abandonment, constant 'flu-like' symptoms, poor memory ('like I'm in a fog'), exhaustion, [and] poor concentration." (AR 384.) Ms. Parker diagnosed Major Depression, Recurrent, PTSD, and Generalized Anxiety Disorder. (*Id.*) She also assessed a Global Assessment of Functioning ("GAF") score of 45, with the highest score in the past year being 55. (*Id.*) She stated that Plaintiff's "mental and physical issues have seriously impaired her life for many years." (*Id.*)

In her May 24, 2013 letter, Ms. Parker stated that Plaintiff's "severe depression . . . creates tremendous challenges to completing simple everyday tasks." (AR 406.) She further stated: "I have a deep concern for her and the bleakness of her future due to the stressors of her physical and emotional challenges. These issues have severely impaired her life for many years . . . ." (*Id.*) Ms. Parker did note, however, that Plaintiff took one class at a community college and "did very well," but that she missed the first two weeks of the next round of classes due to "miscommunication." (AR 405.) Ms. Parker also quoted Plaintiff as saying that if working is "physically possible, I'll do it then suffer with pain." (*Id.*)

In her March 5, 2014 letter, Ms. Parker observed that Plaintiff "struggle[s] with constant debilitating pain creating a cycle of hopelessness, depression and anxiety." (AR 621.) She diagnosed Major Depression, severe/recurrent, and Anxiety NOS. (*Id.*) She listed Plaintiff's prognosis as "[p]oor" and continued to describe Plaintiff's life as "severely impaired." (AR 622.)

Ms. Parker wrote two treatment summaries after Plaintiff filed her appeal in 2015 but before the court issued its 2017 remand order. She wrote one treatment summary on September 1, 2016. (AR 1218.) She wrote another treatment summary on February 7, 2017. (AR 1286.)

### B.     The Court's 2017 Remand Order

The ALJ's May 7, 2014 decision assigned "limited weight" to Ms. Parker's opinions and articulated reasons for the weight assigned. (AR 25.) In its May 8, 2017 remand order, the court noted that Ms. Parker is a treating medical source and held that the ALJ failed to give good reasons for affording less than controlling weight to Ms. Parker's opinion. (*See* AR 858–63.) The court found that Ms. Parker's diagnoses of depression, anxiety, and PTSD to be "consistent

with the bulk of the evidence in this case." (AR 860.) The court noted the opinion of Theodore

Miller, M.D.—which did not include diagnoses of depression or PTSD[5]—but concluded that

Dr. Miller's "failure to diagnose depression, anxiety and PTSD . . . contradicts the rest of the

medical evidence in this case." (AR 861.) The court found that the inconsistency between

Ms. Parker's opinion and Dr. Miller's opinion was not a good reason for giving less than

controlling weight to Ms. Parker's opinion. (*Id.*)

The court also reviewed the other reasons that the ALJ listed for the weight assigned to

Ms. Parker's opinions and found none of them to be good reasons. The ALJ reasoned that

Ms. Parker had "provided very [few] clinical observations regarding mental health issues."

(AR 25.) The court rejected that rationale, stating that the observations in Ms. Parker's reports

"are based on her ongoing, years-long psychotherapy with Plaintiff." (AR 862.) Regarding the

ALJ's suggestion that Ms. Parker's opinion was based in part on Plaintiff's physical issues—an

area outside of Ms. Parker's expertise—the court found that Ms. Parker's opinion "concerning

Plaintiff's mental health status, as well as her opinion about the connection between Plaintiff's

physical impairments and her psychological problems, was supported by acceptable diagnostic

techniques and was consistent with substantial evidence in the record." (*Id.*)

The court was also not persuaded by the ALJ's suggestion that Ms. Parker's opinions

were inconsistent with her own notations that Plaintiff "presents very pleasantly" and "does

spend time communicating with friends." (AR 25.) The court found that the ALJ had

"distort[ed]" Ms. Parker's actual report, which the court found to be consistent with Dr. Miller's

---

[5] Dr. Miller examined Plaintiff on November 28, 2012 and wrote that his initial clinical impression was that Plaintiff has "a history of social anxiety disorder and some degree of persistent dysphoria most likely meeting criteria for dysthymic disorder rather than major depression." (AR 354–55.)

observations of social anxiety and distrust. (AR 861.) Finally, the court was unconvinced by the ALJ's reasoning that Ms. Parker had failed to "provide specific functional limitations." (AR 25.) The court reasoned that "to the extent that Parker's observations of Plaintiff's mental health symptoms were too limited to reach a conclusion on her disability, it was the ALJ's duty to contact Parker, as Plaintiff's treating psychologist, to elicit additional details." (AR 862.) The court accordingly remanded the case for agency reconsideration and ordered the agency, "to the extent necessary, to contact Camille Parker to fully develop her opinions regarding Plaintiff's mental health limitations." (AR 863.)

Near the end of its decision, the court wrote that "the ALJ's failure to grant greater weight to Parker's opinions and to fully develop the record concerning Plaintiff's mental capacity was erroneous." (AR 868.) The court stated that "the ALJ should have granted greater weight to the opinions of Plaintiff's long-term mental health care provider, and should have fully developed the record regarding her mental RFC by following up with Parker on Plaintiff's limitations." (*Id.*) In particular, the court wrote, "Plaintiff's medical records corroborated her testimony that she suffered from panic attacks and had to be picked up on the side of the road on occasion." (*Id.*)

The court observed that, "[d]epending on the frequency of these attacks, such mental health symptoms could cause Plaintiff to miss more than twelve days of work per year." (*Id.*) The court found that "the ALJ's conclusion concerning the number of work days per year that Plaintiff would miss due to her trauma-induced panic attacks is not supported by substantial evidence." (AR 869.) The court ordered the Commissioner on remand to "specifically consider Parker's opinion in determining the number of days of work Plaintiff would be expected to miss, and fully develop the record on this aspect of Plaintiff's limitations." (*Id.*)

## C.    Ms. Parker's Post-Remand Opinions

It appears that, after the 2017 remand order, the ALJ did not contact Ms. Parker to request further information regarding Plaintiff's mental health opinions. Instead, it appears that the ALJ arranged for medical expert Dr. Claiborn to testify at the July 24, 2018 hearing. The court discusses Dr. Claiborn's testimony below. *See infra*, Part II.B. Counsel for Plaintiff represents that she contacted Ms. Parker prior to the July 2018 hearing to obtain further opinion evidence. (Doc. 10 at 5.) The court summarizes that additional evidence here.

In a "Treatment Summary" dated May 22, 2018, Ms. Parker summarized her therapeutic work with Plaintiff since they began treatment in 2010. (AR 1308.) She described Plaintiff's presenting problem and her family and psychosocial history. (AR 1308–12.) In particular, Ms. Parker stated that Plaintiff's IBS makes her unable to eat or drink before going out. (AR 1311.) She also stated that Plaintiff is very anxious about driving a car and that "[s]he cancels appointments if there is any hint of rain or snow." (AR 1309.) Ms. Parker further observed that Plaintiff avoids going to unfamiliar places, struggles with answering the door or phone, and is anxious in crowded areas. (AR 1309, 1311.) According to Ms. Parker, "[t]he prospect of having to drive somewhere unfamiliar to meet with a different Doctor always triggers a trauma reaction which will include an avoidance of making the appointment, avoidance of following through with the appointment then obsessive anxiety, guilt and depressive symptoms." (AR 1311.) Ms. Parker described the reaction as including "heart palpitations, sweating, trembling, shortness of breath, nausea, dizziness, and a fear of losing control." (*Id.*)

Ms. Parker wrote a "diagnostic picture" that included chronic PTSD, chronic and severe Major Depressive Disorder, and Generalized Anxiety Disorder with panic attacks. (AR 1312.) She also listed "severe problems with daily functioning, financial stress, Occupational issues,

social isolation, problems with Primary Support network." (*Id.*) She assessed a current GAF score of 45. (*Id.*) She stated that her opinion of Plaintiff's long-term functioning is "poor." (*Id.*) She stated that each day is a "tremendous challenge" for Plaintiff to complete simple daily living tasks. (*Id.*)

Ms. Parker offered additional opinions in a "Mental Impairment Questionnaire" dated May 28, 2018. (AR 1320–25.) She listed the following clinical findings in support of the severity of Plaintiff's mental impairment and symptoms: "PTSD symptoms include avoidance behavior, panic attacks, chronic anxiety, inability to sustain learned skills, depression includes fatigue, loss of interest, low self-esteem." (AR 1320.) She listed Plaintiff's prognosis as poor. She checked off 26 signs and symptoms, including, for example, qualitative deficits in communication and social interaction, thoughts of death or suicide, panic attacks, pressured speech, repetitive behaviors, and appetite disturbance. (AR 1321.)

Regarding mental abilities and aptitudes needed to do unskilled work, Ms. Parker checked six categories of serious limitation[6] and three categories of "no useful ability to function."[7] (AR 1322.) She did not complete a written explanation for those limitations. (AR 1323.) Regarding mental abilities and aptitudes to do semiskilled and skilled work, Ms. Parker opined that Plaintiff is seriously limited in three areas: ability to understand and

---

[6] The six categories that Ms. Parker identified are: (1) ability to maintain attention for a two-hour segment; (2) the ability to work in coordination with or proximity to others without being unduly distracted; (3) the ability to make simple work-related decisions; (4) the ability to ask simple questions or request assistance; (5) the ability to respond appropriately to changes in a routine work setting; and (6) the ability to deal with normal work stress. (AR 1322.)

[7] These three categories are: (1) ability to maintain regular attendance and be punctual within customary, usually strict tolerances; (2) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and (3) ability to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*)

remember detailed instructions, ability to carry out detailed instructions, and ability to deal with the stress of such work. (*Id.*) Regarding the former two abilities, Ms. Parker explained that Plaintiff "would need a written, detailed reference to follow steps especially if it entails numbers otherwise she gets confused, uncertain, insecure, self-doubting." (*Id.*) Regarding ability to deal with stress, Ms. Parker opined: "As soon as [Plaintiff] feels stress, she gets overwhelmed very easily which can trigger panic, IBS, shutdown, physical pain [with] lasting effects." (*Id.*)

Regarding mental abilities and aptitude needed to do particular types of jobs, Ms. Parker opined that Plaintiff is seriously limited with respect to interacting appropriately with the general public and traveling in unfamiliar places. (AR 1323.) She explained that Plaintiff has "fear/anxiety of being unprepared or ill equipped to respond to a request" and "tends to panic + 'shut down.'" (*Id.*) She further explained that "[t]ravel is the biggest trigger for panic leading to 'shutdown' that means inability to think clearly, to respond appropriately, to prioritize." (*Id.*) Ms. Parker further opined that Plaintiff has no useful ability to use public transportation, explaining: "Travelling is biggest trigger especially if someone else is driving." (*Id.*)

Ms. Parker also opined that Plaintiff's psychiatric condition exacerbates her fibromyalgia pain. (*Id.*) She explained that stress and anxiety "rapidly increase" fibromyalgia pain and "will trigger IBS symptoms." (*Id.*) She noted that "[a]n extended period of stress can lead to migraine headache [with] nausea." (*Id.*)

Ms. Parker supplied ratings of limitation in nine areas. (AR 1324.) She rated "marked" limitations in remembering and applying information, interacting with others, and concentrating. (*Id.*) She rated "extreme" limitations in persisting, maintaining pace, adapting in the workplace, and managing oneself in the workplace. (*Id.*) She explained:

> This is the crux of the problem, nothing is consistent – meaning if [Plaintiff] is struggling [with] Fibromyalgia pain, anxiety, + overwhelm, then her functioning is

extremely poor. Then, [Plaintiff] may have a lower pain day [with] lowered anxiety + she can function quite well – [within] her limits[,] which means she can accomplish basic daily living responsibilities. It is impossible to be accurate [with] the questions due to the shifting nature of physical + emotional pain – that we know is a "consistent" state of being for [Plaintiff] which has been the case for many years, + it has deteriorated over the years.

(*Id.*) Ms. Parker opined that Plaintiff's impairments would cause her to be absent from work more than four days per month. (AR 1325.) Ms. Parker further opined that Plaintiff could manage benefits in her own best interest. (*Id.*)

### D. The ALJ's 2019 Decision

The ALJ assigned "lesser weight" to all of Ms. Parker's 2013 and 2014 letters and to her 2016, 2017, and 2018 treatment summaries. (AR 686.) The ALJ articulated various reasons for the weight she assigned to Ms. Parker's letters and treatment summaries: (1) Ms. Parker focused as much on Plaintiff's physical issues as her reported psychological symptoms, and implied that Plaintiff's physical (not mental) conditions limited her ability to work; (2) Ms. Parker's treatment notes are not part of the record; (3) Plaintiff did very well in a community college class and stated she would work if physically possible; (4) Plaintiff's reported inability to complete everyday tasks is inconsistent with a 2012 statement from Ms. Parker to her primary care provider, Physician Assistant Lauren Talesnick; (5) Ms. Parker's description of Plaintiff as shy and withdrawn is inconsistent with Plaintiff's presentation to other providers; (6) many of the symptoms that Ms. Parker listed were not reported to other treating providers and not supported by Plaintiff's presentation on clinical examinations; (7) Ms. Parker's May 2018 treatment summary included more significant symptoms than mentioned in earlier summaries. (*See* AR 686–87.)

Regarding the GAF scores that Ms. Parker assigned in her treatment summaries, the ALJ concluded that the scores have "limited evidentiary value" without contemporaneous treatment

notes. (AR 687.) The ALJ also stated that Ms. Parker is "not an acceptable medical source."
(*Id.*) And the ALJ found that the GAF scores were "inconsistent with the claimant's presentation
on mental status examinations throughout the record, her performance during the
November 2015 neuropsychological evaluation, as well as her reported activities throughout the
record." (*Id.*)

The ALJ also assigned "lesser weight" to Ms. Parker's May 2018 Mental Impairment
Questionnaire. (*Id.*) The ALJ articulated multiple reasons for assigning that weight: (1) the ALJ
found Ms. Parker's opinions to be unsupported by Plaintiff's "presentation and reports
throughout the record"; (2) Plaintiff was able to meet with an unfamiliar provider—Dr. Root—
without having an "trauma reaction"; (3) according to the ALJ, the limitations in functioning that
Ms. Parker described were inconsistent with Plaintiff's ability to care for her teenage daughter
and Plaintiff's ability to live alone and care for herself and her home; (4) Ms. Parker's treatment
notes are not in the record; (5) Ms. Parker's indication that Plaintiff would be able to manage her
own benefits is inconsistent with the "marked" and "extreme" limitations that she assessed; and
(6) Ms. Parker's opinion that Plaintiff would miss four or more days of work is speculative and
not supported by the evidence. (*See* AR 687–88.)

The ALJ did give Ms. Parker's opinion some weight "in light of her treatment
relationship with the claimant and because there is support for some mental functional
limitations in the record." (AR 688.) But the ALJ did not give Ms. Parker's opinion "greater
weight" because, according to the ALJ, "the limitations she assessed are inconsistent with the
claimant's presentation throughout the record, including her generally normal performance on
mental status examinations" and because the degree of mental limitations is "inconsistent with
the claimant's reported daily activities." (*Id.*) The ALJ also stated that Ms. Parker's opinion was

not entitled to controlling weight because she is not an acceptable medical source. (*Id.*) The ALJ alternatively stated that even if Ms. Parker was an acceptable medical source, her opinion would still not be entitled to controlling weight because, according to the ALJ, the lack of contemporaneous treatment notes means the opinion is not well supported, and because the opinion is inconsistent with the observations of other providers and with other substantial evidence, including Dr. Claiborn's opinion. (*Id.*)

### E. Whether the Remand Order was Violated

Initially, the court concludes that the ALJ did not violate the requirement in the 2017 remand order to fully develop Ms. Parker's opinions regarding Plaintiff's mental health limitations and the number of days Plaintiff would be expected to miss. The court required that the ALJ contact Ms. Parker "to the extent necessary" to develop her opinions regarding Plaintiff's mental health limitations. (AR 863.) Plaintiff argues that her counsel took the initiative of contacting Ms. Parker "[i]n the absence of any action by the ALJ." (Doc. 10 at 5.) It is unclear whether the ALJ ever intended to contact Ms. Parker, but once Plaintiff's counsel did so, it was no longer necessary for the ALJ to do it.

Similarly, if the ALJ erred in not contacting Ms. Parker, that error was harmless for two reasons. First, counsel for Plaintiff did contact Ms. Parker and obtained her additional opinions, which were admitted into the record. Second, the ALJ obtained the opinion of Dr. Claiborn at the July 24, 2018 hearing. The court concludes that, on the issue of Plaintiff's mental health limitations and the number of days Plaintiff would be expected to miss, the record was sufficiently developed.[8] Indeed, the Commissioner does not argue that the record is inadequately

---

[8] The ALJ observed that Ms. Parker's psychotherapy notes do not appear in the record. The court discusses that issue in more detail below but notes here that the lack of treatment notes can in some cases be a reason to order a consultative exam. *See New v. Berryhill*, No. 5:16-cv-

developed, and Plaintiff has apparently reached this conclusion as well. (*See* Doc. 15 at 6 ("The record is fully developed.").)

The more difficult question is whether the ALJ violated the court's order to grant "greater weight" to Ms. Parker's opinions. (AR 868.)[9] The court did not specify precisely how much more weight the ALJ was required to afford those opinions. Notably, the ALJ assigned "limited weight" to Ms. Parker's opinions in 2014 (AR 25) and assigned "lesser weight" to her opinions in the 2019 decision now under review (AR 686–87). The court assumes that the ALJ intended "lesser weight" to mean more weight than "limited weight."[10] The court concludes that, ultimately, whether the ALJ complied with the remand order is intertwined with the broader question of whether the ALJ properly assessed the opinion evidence. The court turns to that issue next.

---

93, 2017 WL 519223, at *11 (D. Vt. Feb. 8, 2017) (citing *Karl-Lebbrenz v. Colvin*, No. 12-CV-01099A, 2014 WL 3845414, at *10 (W.D.N.Y. Aug. 5, 2014)). Although Dr. Claiborn did not examine Plaintiff, he did review the record and offered opinions, and the court concludes that Dr. Claiborn's testimony aided in sufficiently developing the record.

[9] The Commissioner asserts that the court did not order the ALJ to afford greater weight to Ms. Parker's opinions, and instead only "disapproved of the ALJ's reason for affording limited weight to those opinions." (Doc. 14 at 7.) In fact, the court did both. (*See* AR 868 ("[T]he ALJ should have granted greater weight to the opinions of Plaintiff's long-term mental health care provider [Ms. Parker] . . . .").)

[10] Presumably the "lesser" weight was intended to be less than the "significant" or "great" weight that the ALJ assigned to other opinions in her 2019 decision, and not less than the "limited" weight that the ALJ assigned to Ms. Parker's opinions in 2014.

## II. Opinion Evidence

### A. Ms. Parker

#### 1. Failure to Identify Ms. Parker as an Acceptable Medical Source

Plaintiff argues that the ALJ's failure to correctly identify Ms. Parker as an acceptable medical source was error and was "highly prejudicial." (Doc. 10 at 4–5; *see also id.* at 8 (arguing that ALJ "did not even consider giving this opinion 'controlling weight'").) The Commissioner's memorandum does not directly address that issue. In her reply, Plaintiff faults the Commissioner for failing to do so. (Doc. 15 at 2.)

Under the applicable regulations, only "acceptable medical sources" can give "medical opinions." 20 C.F.R. § 416.927(a)(1). And the medical opinions of treating sources have been entitled to generally greater weight under the treating-physician rule. Under that rule, an ALJ must first decide whether a treating source's medical opinion is entitled to controlling weight. *Estrella*, 925 F.3d at 95.[11] A treating source's opinion as to the nature and severity of an impairment is given "controlling weight" as long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). Second, if the ALJ decides the opinion is not entitled to controlling weight, she must decide "how much weight, if any, to give it." *Estrella*, 925 F.3d at 95. In doing so, the ALJ must "explicitly consider" the nonexclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion

---

[11] For claims filed after March 27, 2017, the Commissioner does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 416.920c(a). The claims at issue in this case were all filed before March 27, 2017, so the treating-physician rule does apply here.

with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.* at 95–96

(alteration in original) (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)).

The ALJ must give "good reasons" for her conclusions at both steps. *Id.* at 96; *see also*

20 C.F.R. § 416.927(c)(2).

The court has no difficulty concluding that the ALJ erroneously failed to identify

Ms. Parker as an acceptable medical source. The record indicates that she is a licensed

psychologist-Master. And "[i]n Vermont, an individual is considered an 'acceptable medical

source' if all or part of his or her title includes 'Licensed Psychologist, Masters.'" *New v.*

*Berryhill*, No. 5:16-cv-93, 2017 WL 519223, at *11 (D. Vt. Feb. 8, 2017) (citing *Huestis v.*

*Comm'r of Soc. Sec.*, No. 2:13-cv-201, 2014 WL 4209927, at *6 n.6 (D. Vt. Aug. 25, 2014)); *see*

*also Sweet v. Berryhill*, No. 2:16-cv-110, 2017 WL 2615439, at *10 n.6 (D. Vt. June 16, 2017)

(ALJ should have designated "Licensed Clinical Psychologist-Masters" as an acceptable medical

source). Ms. Parker's opinions thus qualified as medical opinions of a treating source.

The court assumes that the Commissioner's position on this issue is that the error was

harmless. Indeed, the Commissioner maintains that the ALJ considered Ms. Parker's opinions

and provided good reasons for the weight assigned. (*See* Doc. 14 at 7.) But as this court stated

in a prior case, "the analysis is not as straightforward as the Commissioner suggests." *Martell v.*

*Comm'r of Soc. Sec.*, No. 2:12-CV-152, 2013 WL 1429459, at *4 (D. Vt. Mar. 22, 2013), *report*

*and recommendation adopted*, 2013 WL 1429457 (D. Vt. Apr. 9, 2013). This is because, for

claims filed before March 27, 2017, an ALJ who recognizes a provider as an acceptable medical

source should analyze that source's opinions differently—"under the exacting standards of the

'treating physician rule'"—than the opinions of a source who is not an acceptable medical

source. *Id.*

The court in *Martell* concluded that a similar failure to identify a source as an acceptable medical source was not harmless because the ALJ only gave two reasons for the weight assigned to the source's opinion: (1) that the source was not an acceptable medical source, and (2) that the opinions were not supported by the source's own records. *Id.* at *5. The first reason was mistaken, and the court found that the second reason was not supported by substantial evidence. *Id.* Of course, *Martell* does not rule out the possibility that a failure to identify a source as an acceptable medical source could be a harmless error under different circumstances. Like *Martell*, the ALJ in this case was mistaken in concluding that Ms. Parker is not an acceptable medical source. But unlike *Martell*, the ALJ gave numerous reasons for the weight assigned to Ms. Parker's opinions, including reasons for assigning less than controlling weight even if Ms. Parker's opinions qualified as medical opinions. *See supra*, Part I.D. The court therefore reviews the ALJ's reasons in detail below.

## 2. Supportability—Absence of Ms. Parker's Treatment Notes

The ALJ noted that Ms. Parker's treatment notes did not appear in the record and reasoned that the notes could not serve as a source of support for Ms. Parker's opinions. (AR 686, 688.) But the absence of psychotherapy notes is not a good reason for discounting Ms. Parker's opinion. *See New*, 2017 WL 519223, at *11 (citing *Soto-Cedeño v. Astrue*, 380 F. App'x 1 (1st Cir. 2010), and policy stating that the administration does not need psychotherapy notes; absence of treatment notes to support treating psychologist's opinions was not a reason to give opinions no weight). The ALJ had the authority to subpoena the psychotherapy notes, but her "failure to do so precluded [her] from relying on any purported inconsistencies as a basis" for affording Ms. Parker's opinions lesser weight. *Tammy H. v. Comm'r of Soc. Sec.*, No. 5:18-CV-851 (ATB), 2019 WL 4142639, at *11 (N.D.N.Y. Aug. 30,

2019). The fact that the ALJ repeatedly mentioned the absence of psychotherapy notes suggests that this error pervaded the ALJ's analysis. This makes it less likely that the ALJ's failure to identify Ms. Parker as an acceptable medical source was a harmless error.

### 3.    Consistency with Other Substantial Evidence

The ALJ also concluded that Ms. Parker's opinions are "inconsistent with observations of other treating and examining providers" and inconsistent with "other substantial evidence." (AR 688.) The court considers the purported inconsistencies in turn.

The ALJ found that Ms. Parker's opinions are inconsistent with the November 28, 2012 opinion of Dr. Miller (AR 353–55). As noted above, Dr. Miller did not diagnose PTSD or depression, whereas Ms. Parker diagnosed both PTSD and major depression. In its May 8, 2017 Opinion and Order, the court concluded that Dr. Miller's failure to diagnose depression, anxiety, and PTSD "contradicts the rest of the medical evidence in this case" and that Ms. Parker's diagnoses "appear consistent with substantial evidence in the case record." (AR 861.) The court has carefully reviewed the materials that have been added to the record since the prior appeal. As described below, the more recent evidence does not alter the court's view on this point.

The ALJ also found that Ms. Parker's opinions are inconsistent with treatment notes from Plaintiff's visits to her primary care provider. (AR 688.) According to the ALJ, "even during periods of reported severe anxiety, the claimant still generally presented within normal limits on mental status examinations." (AR 681.) The ALJ found that Nurse Practitioner Patricia Brown "regularly observed that the claimant was alert, oriented, and neither anxious nor depressed; she was able to articulate well with normal speech, she was able to perform basic computations and apply abstract reasoning, she was able to recall recent and remote events, and her fund of knowledge was intact." (*Id.*) The ALJ concluded that "[o]verall, these treatment notes do not

show that the claimant's conditions result in a need for work-related restrictions in excess of those identified" in the RFC. (*Id.*)

Here, it is true that multiple treatment notes from appointments with NP Brown include statements that Plaintiff generally appeared in no apparent distress; as not anxious or depressed; and that neuropsychiatric exam showed "normal" mood and affect. (*See* AR 1153, 1156, 1159, 1161, 1164, 1166, 1174, 1177, 1187, 1294.) At a March 13, 2017 appointment, NP Brown noted that Plaintiff's chronic anxiety was "stable" and that Plaintiff was "doing well." (AR 1153.) But NP Brown also recognized Plaintiff's anxiety and PTSD, prescribed anxiety medications, and encouraged psychotherapy to treat it. (*See, e.g.*, AR 1156 ("[H]as panic times-still."); AR 1159 ("[S]till high anxiety."); AR 1187 ("Anxiety is likely related to posttraumatic stress – is consistent with counseling."); AR 1199 (anxiety "still pretty high"); AR 1294 (encouraging Plaintiff to make appointment with Ms. Parker "as [it] has been awhile").) In addition, NP Brown did note at a November 20, 2016 appointment that Plaintiff experienced "off [the] charts" anxiety due to an episode when she thought her daughter was lost. (AR 1161.)

Multiple other treatment notes from NP Brown refer to Plaintiff's PTSD or anxiety. (*See* AR 1152, 1163, 1188, 1198, 1293.) In a fibromyalgia medical source statement, NP Brown opined that Plaintiff lacks the stamina and endurance to work an easy job eight hours per day five days per week, explaining: "not only does [patient] have fibromyalgia but severe agoraphobia as well—makes her afraid to leave home." (AR 1304.) She opined that Plaintiff is incapable of even "low stress" work and estimated that she would be absent from work as a result of impairments or treatment more than four days per month. (AR 1306.) She reiterated that Plaintiff's fibromyalgia persists and that she suffers from "severe anxiety (+) agoraphobia." (*Id.*)

Moreover, Plaintiff's presentation at primary care appointments reveals relatively little about her overall mental health condition because the appointments only constitute "snapshot[s]" at single moments in time. *Amy P. v. Comm'r of Soc. Sec.*, No. 2:17-cv-94, 2018 WL 2095345, at *6 (D. Vt. May 7, 2018) (quoting *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016)). And "objectively neutral assessments"—like NP Brown's regarding mood, affect, orientation, speech, and reasoning—are not inconsistent with Ms. Parker's opinions that Plaintiff's depression, anxiety, and PTSD are severely limiting. Indeed, "it is possible for a claimant to appear 'normal' at a medical appointment while at the same time suffering from debilitating depression or another mental illness." *Id.* (quoting *Moody v. Berryhill*, No. 16-CV-03646-JSC, 2017 WL 3215353, at *10 (N.D. Cal. July 28, 2017)). The court accordingly concludes that the purportedly inconsistent primary care treatment notes are not a good reason for discounting Ms. Parker's opinions.

The ALJ also found the limitations in Ms. Parker's opinions to be "inconsistent with the claimant's reported daily activities, including being able to live alone, caring for her teenaged daughter, caring for pets, attending meetings, and maintaining her house." (AR 688.) Plaintiff does not dispute that the record reflects those activities. But she asserts that "[t]hese activities, as actually performed . . . , were not comparable to full time employment, and were not inconsistent with the severe symptoms she reported." (Doc. 10 at 10.) The court agrees with Plaintiff on this point. Plaintiff testified that she had to pace herself and take breaks when doing household chores. She reported that her daughter and friends help her care for pets. (AR 1108.) There is insufficient evidence that Plaintiff's daily activities reflect an ability to perform full-time work. *See Melanie M. v. Berryhill*, No. 5:18-cv-149, 2019 WL 3852699, at *19 (D. Vt. Aug. 16, 2019) ("Plaintiff's ability to do some light chores, visit family members, and attend medical

appointments does not indicate that she can work full time."); *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (claimant need not be an invalid to receive disability benefits).

Also relating to Plaintiff's abilities to complete daily tasks, the ALJ found that Ms. Parker's opinions were inconsistent with her September 2012 statement to Physician Assistant Lauren Talesnick to the effect that "[i]n the past [Plaintiff's] PTSD was so severe [that] [Plaintiff] was unable to complete normal [activities of daily living]. Now [Plaintiff] is functioning well, able to care for her 13 year old daughter and started to take college level courses." (AR 333.) For the reasons stated above and below, that level of functioning is not inconsistent with the limitations described in Ms. Parker's opinions.

The ALJ further reasoned that Ms. Parker's opinions were internally inconsistent. The ALJ cited Ms. Parker's statement in her May 24, 2013 letter that Plaintiff took a class at a local community college and "did very well." (AR 405.) The ALJ correctly observed that Ms. Parker's May 2013 letter did not attribute Plaintiff's failure to continue with classes to mental or physical health issues. (*See* AR 686.) Indeed, Ms. Parker wrote that "[f]or the next round of classes, [Plaintiff] missed the first two weeks due to miscommunication" and that Plaintiff "has no money and no way to make payments." (AR 405.) But the ability to complete a single class does not reflect an ability to work full time. And Ms. Parker's May 22, 2018 treatment summary adds more detail, stating that Plaintiff was unable to continue classes due to lack of finances *and* "the debilitating intensity of her issues." (AR 1310.)

The ALJ also relied on the portion of Ms. Parker's May 24, 2013 letter quoting Plaintiff as stating that "[i]f it's physically possible, I'll do it [work] then suffer with pain." (AR 405.) The ALJ interpreted that statement as suggesting that Plaintiff believed that no mental impairment impacted her ability to work. (*See* AR 686.) In light of the other evidence in the

record, the court concludes that the ALJ's interpretation of that isolated statement is not reasonable. Moreover, as the court previously held, Plaintiff's physical impairments are connected to her psychological problems. (*See* AR 862 (substantial evidence in the record supported Ms. Parker's opinion about the connection between Plaintiff's physical impairments and her psychological problems).)

The ALJ also found that Ms. Parker's opinions were internally inconsistent insofar as Ms. Parker assessed significant limitations but also opined that Plaintiff can manage benefits in her own best interest. (*See* AR 688, 1325.) The court agrees that the ALJ identified a partial inconsistency here. *See Pelletier v. Colvin*, No. 13-651 ML, 2015 WL 247711, at *13 (D.R.I. Jan. 20, 2015) (ALJ noted inconsistency between treating psychologist's opinion that the plaintiff could manage benefits with opinion that the plaintiff had "no useful ability to function" in understanding, remembering, or carrying out short and simple instructions); *Brown v. Colvin*, No. 14-cv-51-PB, 2014 WL 6670637, at *13 (D.N.H. Nov. 24, 2014) (finding no error in ALJ's assignment of little weight to treating psychiatrist's opinion because, among other things, there was "some inconsistency" between the psychiatrist's assessment of moderate to marked limitations in concentration, persistence, and pace and his opinion that the claimant would be able to manage her own benefits, if awarded).

But "the ability to manage one's own benefits may not always be inconsistent with disabling functional limitations." *Cannon v. Colvin*, No. 15-1530, 2016 WL 1449245, at *6 (E.D. Pa. Apr. 13, 2016). Here—in light of the court's analysis of all of the circumstances—any inconsistency on this point is insufficient to justify a significant reduction in the weight assigned to Ms. Parker's opinions. *See Perkins v. Berryhill*, No. 17-1013 TNM/DAR, 2019 WL 2010696, at *5 (D.D.C. Mar. 13, 2019) (ALJ's reasons for giving little weight to treating psychiatrist's

opinion—including inconsistency between finding many marked limitations and claimant's ability to manage her own benefits—were "wholly inadequate"), *report and recommendation adopted in pertinent part*, 379 F. Supp. 3d 1 (D.D.C. 2019).

The ALJ further concluded that Ms. Parker's opinions were inconsistent with respect to Plaintiff's ability to relate with others. In a March 4, 2013 note, Ms. Parker wrote that Plaintiff is "very pleasant to engage with when she feels understood + cared about otherwise very shy + withdrawing/avoiding." (AR 382.) In her May 22, 2018 treatment summary, Ms. Parker also stated that for Plaintiff "[t]he prospect of having to drive somewhere unfamiliar to meet with a different Doctor always triggers a trauma reaction which will include an avoidance of making the appointment, avoidance of following through with the appointment then obsessive anxiety, guilt and depressive symptoms." (AR 1311.)

The ALJ found those statements to be inconsistent with Plaintiff's presentation to other providers, some of whom, like Dr. Root, were previously unknown to Plaintiff. (AR 686–87.) The ALJ cited several instances in the record where providers noted that Plaintiff was not in distress or made no mention of any overt difficulties Plaintiff had in the interaction. (*See* AR 303 (Plaintiff met Robert McLellan, M.D. for disability consultation on June 1, 2011; notation that she "appears in no distress"); AR 354 (Plaintiff met Dr. Miller for evaluation on November 28, 2012; notation that she "does not appear either severely anxious or severely depressed at this time"); AR 309 (Plaintiff met rheumatologist Lin Brown, M.D. for consultation on January 17, 2013; she was "in no acute distress" upon physical examination); AR 1209 (Plaintiff met Debra Lloyd, APRN on April 8, 2014; notation that Plaintiff is "[p]leasant" and "in no acute distress"); AR 1344 (Plaintiff met Dr. Root on November 13, 2015; no notation of distress or difficulties interacting); AR 1222 (Plaintiff met Alan Lilly, M.D. for a consultative

examination on November 17, 2016; notation that upon physical examination she was "very pleasant" and "in no evident distress").)

None of these notations are inconsistent with Ms. Parker's opinions. Indeed, several providers noted that Plaintiff was pleasant to engage with, suggesting (in Ms. Parker's words) that Plaintiff felt understood and cared about at those appointments. The invariable "trauma reaction" that Ms. Parker described concerned the prospect of having to drive somewhere unfamiliar to meet with a different provider. The avoidance and other symptoms appear to relate primarily to the *anticipation* of driving to an unfamiliar location. It is perhaps unsurprising that, after arriving, Plaintiff was able to interact appropriately with various treatment providers.

The court rejects the ALJ's criticism of Ms. Parker's May 2018 treatment summary for including "more significant symptoms than previously mentioned in her past summaries." (AR 686.) The purpose of the court's 2017 remand was to fully develop the record concerning Plaintiff's trauma-induced panic attacks and their contribution to the number of workdays Plaintiff would miss. In the court's view, the fact that Ms. Parker's May 2018 treatment summary includes more detail does not undermine her opinions.

Finally, with respect to consistency, the ALJ specifically concluded that Ms. Parker's opinion is inconsistent with Dr. Claiborn's opinion. (AR 688.) The court considers his opinion next.

### B. Dr. Claiborn

#### 1. Testimony at July 24, 2018 Hearing

Dr. Claiborn testified at the July 24, 2018 hearing. He did not examine or treat Plaintiff, but he reviewed medical exhibits prior to offering his testimony. At the outset of his testimony he noted a "concern" that the evidence from Ms. Parker consisted of summary letters rather than

treatment notes. (AR 740.) The ALJ stated: "That is correct. We're unable to get any treatment notes." (*Id.*) In addition, as noted above, Dr. Claiborn did not review Dr. Root's November 13, 2015 evaluation until after the hearing. He stated that he was reluctant to say much about Dr. Root's report without having read it, and agreed to review the report after the hearing and state whether it changed his opinion. (AR 742.) He testified that there was sufficient evidence for him to form opinions, which he offered at the hearing. (*Id.*)

First, Dr. Claiborn identified Plaintiff's medically determinable impairments. He stated that she has an affective disorder ("persistent depressive disorder"). (AR 743.) He also stated that she has an anxiety disorder (described in various terms, but "probably best described as an anxiety disorder not otherwise specified"). (*Id.*) He noted reference to PTSD throughout the record but stated that PTSD was not described in the available continuous clinical records. (*Id.*) He opined that PTSD was not clearly established. (*See id.*; *see also* AR 753 ("[S]he may have PTSD. I don't think it's clearly established."); AR 755 ("[W]hat is in the records to me is not sufficient to establish the diagnosis of the PTSD.").)

Next, Dr. Claiborn opined that Plaintiff's mental impairments do not meet or equal any of the listed impairments. (AR 744.) Regarding the "B" criteria, he opined that Plaintiff's ability to understand, remember, or apply information is "no more than mildly impaired"; that her ability to interact with others is "moderately impaired"; that her concentration, persistence, and pace is "moderately impaired"; and that her ability to adapt and manage herself is "moderately impaired." (*Id.*) He stated that those opinions were based with "emphasis" on Dr. Miller's evaluation. (*Id.*)

Dr. Claiborn opined that Plaintiff's impairments would cause functional limitations. (AR 745.) He stated: "I think because of some concerns about attention and concentration and

things like that, she would probably be restricted to relatively simple, repetitive kinds of tasks."
(*Id.*) Regarding social anxiety, Dr. Claiborn opined that Plaintiff "could work close to co-workers and supervisors without undue difficulty" and that she could have brief or simple interactions with the general public. (AR 745–46.) He further opined that Plaintiff would adapt well "only to occasional changes" and that "I assume that because of some concerns about driving, that jobs requiring a lot of travel would be difficult." (AR 745–46.) Regarding ability to adhere to a schedule or maintain attendance, Dr. Claiborn stated: "There was some mention in the record of her not driving in bad weather for example. Now that—if that persists, that would obviously—a lot of trouble, leads to some problems with being at work on a scheduled basis during periods of bad weather." (AR 746.)

Regarding maintaining pace or persisting at tasks, Dr. Claiborn stated that he did not see any "clear descriptions of [Plaintiff's] psychological functioning that would cause what I would think of as significant impairment with persistence or pace . . . ." (AR 747.) He noted that depression, when it was worse, would have an effect on concentration. (*Id.*) He disagreed with Ms. Parker's assessment of "marked" limitations in concentrating and "extreme" limitations in persisting and maintaining pace. He opined that other sources did not describe such limitations. (*See* AR 748.) He also opined that a person with "marked" or "extreme" limitations in multiple parameters would generally need a guardian or inpatient care, but that Plaintiff's medical records were not consistent with that level of impairment. (AR 749.)

Dr. Claiborn also disagreed with Ms. Parker's opinion that Plaintiff would miss more than four days of work per month. He stated: "I don't see in the records of her presentation at clinical, you know, visits with other providers sufficient evidence to support that conclusion." (AR 751.) Dr. Claiborn testified that he would "hesitate" to opine as to how many days of work

Plaintiff would miss per month due to psychiatric symptoms and that he did not think he could give a number of days that she would miss. (AR 755.)

### 2. Dr. Root's November 13, 2015 Assessment and Dr. Claiborn's Response

Dr. Claiborn reviewed Dr. Root's November 13, 2015 assessment after the July 24, 2018 hearing. Dr. Root's assessment consists of a two-page single-spaced letter and a three-page "Test Results Addendum." (AR 1344–48.) Based on clinical interviews, record review, and testing that he administered, Dr. Root offered the following "provisional diagnostic impressions":

- Posttraumatic Stress Disorder, Chronic
- Persistent (Dysthymic) Depressive Disorder
- Anxiety Disorder NOS
- Pain Disorder NOS
- Personality Disorder Traits of a[n] Avoidant Compulsive Type Dependent
- Rule Out Sleep Disorder

(AR 1344.) Discussing relevant background information, Dr. Root stated that Plaintiff reported that her adjustment problems "started largely in 1997 after a traumatic motor vehicle accident." (*Id.*) Dr. Root also noted that Plaintiff "has been married once and reports that her husband was emotionally and verbally abusive to her." (*Id.*) "In addition she has survived physical, emotional/verbal abuse and [was] sexually abused." (*Id.*)

Dr. Root wrote that "[Plaintiff] describes significant PTSD symptomatology including intrusive thoughts, avoidant behavior, and hyperreactivity. Personality assessment measures are broadly consistent with [Plaintiff] having PTSD." (*Id.*) Dr. Root noted that Plaintiff reported three significant head traumas. (*Id.*) He also noted that she reported the following problems: "change in smell and taste, migraines, muscle weakness, lack of balance, coordination problems, numbness, lack of feeling, headaches, femur and wrist fractures, and fibromyalgia." (AR 1345.)

31

He stated that Plaintiff "is dealing with significant stress associated with family members medical and psychological problems." (*Id.*)

While assessment results showed Plaintiff to be functioning in the "well above average range" of intellectual ability, measures of her behavioral and personality functioning found "indications of significant levels of particularly depression and obsessive compulsive symptomatology, as well as posttraumatic stress disorder symptomatology." (*Id.*) In particular, Plaintiff scored "well above average" on the Achenbach Adult Self-Report for depressive, anxiety, avoidant personality, ADHD, and antisocial problems. (AR 1347.) Her scores on the Beck Anxiety Inventory and Beck Depression Inventory-II were both within the "severely impaired" range. (*Id.*) On the Minnesota Multiphasic Personality Inventory-2, she scored "well above average" for hypochondriasis, psychopathic deviate, schizophrenia, social introversion, addictions acknowledgement scale, and the Keane PTSD scale. (*See id.*) She scored "upper extreme" for depression and psychasthenia. (*Id.*) Dr. Root recommended continued individual psychotherapy, "narrative supportive long-term psychotherapy," "psychopharmacological treatment," and continued services from Vermont Vocational Rehabilitation Services. (AR 1345.)

In a post-hearing filing dated September 29, 2018,[12] Dr. Claiborn responded to a question asking whether Dr. Root's assessment changed the opinion that Dr. Claiborn offered at the July 24, 2018 hearing. (AR 1365.) Dr. Claiborn wrote that Dr. Root's assessment "reports but does not describe 4 of 5 required symptoms for PTSD and offers provisional diagnostic impressions." (*Id.*) He went on to state:

---

[12] As noted above, Dr. Claiborn's statement is hand-dated "9/29/15." (AR 1365.) The correct year is plainly 2018, since the statement refers to the July 24, 2018 hearing. (*Id.*)

The report also includes measures of intellectual function and . . . psychological function in a range from average to well above average. The limitations I indicated before remain the same in my opinion after consideration of [Dr. Root's assessment]. The diagnosis of PTSD [was] provisional not fully established. I see no change in the evaluation.

(*Id.*)

### 3. Dr. Root's Response to Dr. Claiborn's September 29, 2018 Filing

Plaintiff's counsel asked Dr. Root to respond to Dr. Claiborn's September 29, 2018 statement. (AR 1359.) Dr. Root wrote that his November 13, 2015 assessment was intended for "clinical differential diagnosis and treatment purposes, in contrast with an assessment requested for differential diagnosis and treatment purposes to be used in a forensic setting." (AR 1360.) He explained that he used the term "provisional" because his diagnostic impressions were provided to Ms. Parker, "who already had related information gained from her psychotherapeutic services provided to [Plaintiff]." (*Id.*) According to Dr. Root, his "provisional" diagnostic impressions "were to be used in conjunction with other information that Ms. Parker had already gained in her ongoing differential diagnostic and treatment process with [Plaintiff]." (*Id.*)

Dr. Root opined that Dr. Claiborn's September 29, 2018 letter did not accurately characterize the November 13, 2015 assessment. (AR 1360–61.) He faulted Dr. Claiborn for failing to mention most of the diagnoses stated in the assessment. (AR 1360.) He also faulted Dr. Claiborn for failing to mention the test results that showed "clinically significant, well above average to upper extreme, levels of psychopathological symptomatology." (*Id.*)

Responding to Dr. Claiborn's criticism that the November 13, 2015 assessment mentioned but did not describe four out of five symptoms for PTSD, Dr. Root stated that there are eight PTSD diagnostic criteria in the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5). (AR 1361.) Dr. Root discussed each of the eight criteria as follows (Dr. Root's commentary in his italics):

**Criterion A (one required):** The person was exposed to: death, threatened death, actual or threatened serious injury, or actual or threatened sexual violence, in the following way(s):

- Direct exposure – *1997 traumatic MVA; physical, emotional/verbal abuse and sexual[] abuse.*

**Criterion B (one required):** The traumatic event is intrusively re-experienced, in the following way(s):

- Unwanted upsetting memories – *intrusive thoughts of 1997 traumatic MVA and associated with her history of physical, emotional/verbal and sexual[] abuse.*
- Physical reactivity after exposure to traumatic reminders – *hyperreactivity to stimuli associated with 1997 traumatic MVA and associated with her history of physical, emotional/verbal and sexual[] abuse.*

**Criterion C (one required):** Persistent avoidance of trauma-related stimuli after the trauma, in the following way(s):

- Trauma-related reminders – *avoidance of stimuli related to 1997 traumatic MVA and associated with her history of physical, emotional/verbal and sexual[] abuse.*

**Criterion D (two required):** Negative alterations in thoughts or feelings that began or worsened after the trauma, in the following way(s):

- Negative affect – *lack of feeling, depressed mood.*
- Decreased interest in activities – *feelings of numbness, lack of feeling, anxious.*
- Difficulty experiencing positive affect – *lack of feeling, anxious.*

**Criterion E (two required):** Trauma-related marked arousal and reactivity that began or worsened after the trauma, in the following way(s):

- Hypervigilance – *hypervigilance to stimuli associated with 1997 traumatic MVA and associated with her history of physical, emotional/verbal and sexual[] abuse.*
- Heightened startle reaction – *hyperreactivity to stimuli associated with 1997 traumatic MVA and associated with her history of physical, emotional/verbal and sexual[] abuse.*
- Difficulty sleeping – *sleep problems.*

**Criterion F (required):** Symptoms last for more than 1 month – *Her traumatic motor vehicle accident, from which she has had PTSD symptoms for years, was in 1997. Her physical, emotional/verbal and sexual[] abuse, from which she has had PTSD symptoms for years, was as a child and adult.*

**Criterion G (required):** Symptoms create distress or functional impairment (e.g., social, occupational) – *[Plaintiff] last worked in 1997 and has used the services of Vermont Vocational Rehabilitation Services because of her clinical problems for several years unsuccessfully; she reported feelings of helplessness.*

**Criterion H (required):** Symptoms are not due to medication, substance use, or other illness – *The pattern of test findings of PTSD, in the context of the reported history, is consistent with PTSD not being due to medication, substance use, or other illness.*

(AR 1361–62.) Dr. Root stated that this information, "taken specifically from the undersigned's November 13, 2015 Report, indicates how [Plaintiff] meets the required criterion/symptoms for PTSD." (AR 1362.)

#### 4.    ALJ's Assignment of Great Weight to Dr. Claiborn's Opinions

The ALJ gave great weight to Dr. Claiborn's opinions. (AR 685.) The ALJ summarized Dr. Claiborn's testimony and his statement that Dr. Root's report did not alter his opinion. The ALJ reasoned that although Dr. Claiborn did not treat or examine Plaintiff, "he did review the longitudinal evidence of record in its entirety" and "[h]e also provided a detailed explanation for his opinion, he supported his opinion with citations to the record, and he was subjected to cross-examination by the claimant's representative." (AR 686.) According to the ALJ, Dr. Claiborn's opinion "is additionally persuasive in light of his expertise in psychology and his knowledge of program rules and evidentiary requirements." (*Id.*)

In light of all of the evidence in this case, the court cannot conclude that these constitute good reasons for assigning great weight to Dr. Claiborn's opinions. For the reasons discussed above, the ALJ failed to identify Ms. Parker as an acceptable medical source, and the ALJ's reasons for assigning "lesser weight" to all of Ms. Parker's opinions do not withstand scrutiny. Dr. Claiborn and Ms. Parker have different opinions about Plaintiff's diagnoses and symptoms, and notwithstanding Dr. Claiborn's expertise, review of the record, and explanations, his

opinions can only override a treating source's opinion if "supported by evidence in the record." *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995).

Such evidence to override is lacking in this case. Regarding diagnoses, Dr. Claiborn opined that PTSD was not clearly established. But even before Ms. Parker gave her 2018 opinions, this court found that her PTSD diagnosis was consistent with the bulk of the evidence. (AR 860.) And Dr. Root—who met Plaintiff and examined her—discussed how Plaintiff met the PTSD criteria in the DSM-5. Although the ALJ was careful to state that she fully considered Plaintiff's psychiatric symptoms and mental functioning regardless of specific diagnoses, the ALJ's determination that PTSD was not medically determinable likely impacted the subsequent steps of the determination. *See Penny Lou S. v. Comm'r of Soc. Sec.*, No. 2:18-cv-213, 2019 WL 5078603, at *8 (D. Vt. Oct. 10, 2019) (error in finding condition not medically determinable "impact[s] the subsequent steps of the disability determination process because, once the ALJ [finds] the impairment to be not medically determinable, he [is] not required to consider it in determining Plaintiff's RFC" and because such a finding may alter assessment of credibility).

Regarding symptoms and functional limitations, Dr. Claiborn's discussion of the listings was based largely on Dr. Miller's evaluation. But as this court previously concluded, Dr. Miller failed to diagnose depression, anxiety, and PTSD in contradiction with "the rest of the medical evidence in this case." (AR 861.) Dr. Claiborn suggested that the level of limitations endorsed by Ms. Parker would generally require a guardian or inpatient care, and that the medical records were not consistent with that level of impairment. But Ms. Parker's explanation for the limitations she assessed was that the "crux" of the problem is that Plaintiff's physical and emotional pain is of a "shifting nature." (AR 1324.) The limitations that Ms. Parker endorsed

are therefore not constantly present, but instead reflect Plaintiff's functioning when her symptoms are most acute.

## III. Disposition

For the reasons discussed above, the court concludes that the ALJ failed to give sufficient weight to Ms. Parker's opinions, failed to articulate good reasons for using Dr. Claiborn's opinions to override Ms. Parker's opinions, and ultimately failed to comply with this court's May 8, 2017 remand order. Remand is therefore appropriate. The errors that the court has identified make it unnecessary to separately analyze most of Plaintiff's remaining issues on appeal.

The court must address, however, Plaintiff's argument for remand for calculation of benefits. According to Plaintiff, the record is fully developed and "any reasonable reviewer would conclude that [Plaintiff] is disabled." (Doc. 10 at 27.) The Commissioner maintains that the weight of the evidence does not compel a conclusion that Plaintiff is disabled, and that "substantial evidence supports the ALJ's determination" that she is not. (Doc. 14 at 16.) Plaintiff replies that "[i]f the evidence had been weighed properly under the regulations, any reasonable reviewer would only come to one conclusion." (Doc. 15 at 6.)

Courts have elected to remand for calculation of benefits where there was "no apparent basis to conclude that a more complete record might support the Commissioner's decision." *Butts v. Barnhart*, 388 F.3d 377, 385–86 (2d Cir. 2004) (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)). On the other hand, courts frequently remand for further development of the evidence "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa*, 168 F.3d at 82–83 (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

Here, as discussed above, the record is now sufficiently developed regarding Plaintiff's mental health limitations and the number of days she could be expected to work. The court previously ordered that greater weight be given to the opinions of Plaintiff's treating psychologist, Ms. Parker. With the record now further developed, the court concludes that there is no basis for giving Ms. Parker's opinion less than controlling weight, especially as to Ms. Parker's opinions regarding the variability of Plaintiff's mental health symptoms and that Plaintiff's impairments would cause her to be absent from work more than four days per month. Since there is no apparent basis to conclude that a more complete record might support the Commissioner's decision, the court will remand for calculation of benefits.

## Conclusion

For the reasons stated above, Plaintiff's Motion for Order Reversing the Decision of the Commissioner (Doc. 10) is GRANTED, and the Commissioner's Motion for Order Affirming the Commissioner's Decision (Doc. 14) is DENIED. The case is REMANDED for calculation of benefits.

Dated at Rutland, in the District of Vermont, this __ day of February, 2020.

Geoffrey W. Crawford, Chief Judge
United States District Court